*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

QUAN LE,

Plaintiff-Appellant,

v

MEIJER, INC.,

Defendant-Appellee.

UNPUBLISHED
July 20, 2026
2:30 PM

No. 373828
Eaton Circuit Court
LC No. 2023-001205-NP

Before: M. J. KELLY, P.J., and PATEL and KOROBKIN, JJ.

PER CURIAM.

In this negligence action, plaintiff, Quan Le, appeals as of right the trial court's order granting summary disposition to defendant, Meijer, Inc., under MCR 2.116(C)(10). We reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In September 2023, Le sustained significant injuries to his right leg while operating a standup forklift at Meijer's distribution center in Lansing, Michigan. At the time of the incident, Le was employed by Freight Handlers, Inc. (FHI) as a handler. FHI's handlers unloaded merchandise from tractor trailers at the distribution center. Meijer supplied the material handling devices, including the subject Crown Lift Trucks RC5500 forklift, for the unloading process. FHI was responsible for training its employees to operate the forklifts but Meijer was responsible for maintaining and repairing the forklifts. Before working for FHI, Le had not used a standup forklift. When Le began working for FHI in August 2022, he received training on using a standup forklift. The training included practical hands-on training, presentations, and written examinations.

The RC5500 forklift is operated in a standing position from inside of the operator compartment. The steering is controlled by a steering handle on the left side. A multitask control handle on the right side is used to move the forklift forward and reverse. The multitask control handle also raises and lowers the forklift. There are two methods to stop the forklift: (1) the operator can apply the service brakes by lifting his left heel or moving his left foot off the foot

-1-

brake pedal[1] or (2) the operator can use the multitask control handle to reverse the direction of travel (this process is referred to as "plugging"). Le testified that he always used the plugging method and only used the foot brake when he was exiting the forklift.

Neither braking method will stop the forklift immediately. Crown's operator manual states, "Of the two, the foot brake is designed to stop the truck in the shortest distance. Use the foot brake in an emergency, on ramps or in busy areas." The service manual dictates that the forklift should be adjusted so that the minimum stopping distance is 9.1 to 10.3 feet when the plugging method is used and 9.2 to 9.4 feet when the service brake is used. If the stopping distance exceeds those parameters, proper adjustments must be made.

There were a few dozen forklifts at the distribution center. The workers claimed the forklifts on a first-come, first-served basis at the beginning of each shift. Le had used the subject forklift approximately 20 times before the incident without issue. Once an employee selects a forklift, he or she must complete a preuse inspection checklist. The checklist display for most of the forklifts is connected to the forklift controls. If any questions are answered in the negative, the forklift will automatically lockout. However, some of the forklifts do not have an electronic display and the employee must complete a written checklist. Le maintained that he always completed the preuse inspection and accurately responded to the questions. On the date of the incident, Le conducted a preuse inspection of the subject forklift and completed an "Equipment Safety Inspection Sheet." Le's inspection included both braking systems. He did not detect any issues with the forklift. In fact, immediately after performing the inspection, Le drove the forklift to the front of the warehouse to meet a coworker and the forklift stopped within a normal stopping distance.

Approximately five minutes after Le completed the preuse inspection, he drove the forklift to a desk to log into a computer and that is when the incident occurred. He described the incident as follows:

> I pulled the joystick towards me that's going that way . . . away from the forklift. So I'm going towards the desk. And when I'm getting close to it, then I try to counter it the other way to slow it down. But then I hit it and it wouldn't slow down, and I hit it, like twice and it wouldn't still slow down. And then that's when I took my foot off to try to motor to [sic] brake it, but that's when my foot got caught between the motor and the desk.

Le estimated that he was at least 15 feet from the desk when he first attempted the plugging procedure but the forklift did not slow down. He maintained that he attempted plugging at least twice, maybe three times, to no avail. When the forklift was approximately five feet from the desk, Le removed his foot from the brake pedal to engage the service brake and, for reasons unexplained, moved his left leg outside of the operator's compartment. The forklift did not stop and his left leg was pinned between the forklift and the metal desk, causing significant injuries.

---

[1] The forklift's brake pedal functions the opposite of an automobile brake pedal—stepping down on the forklift's brake pedal disengages the service brake.

When questioned why he moved his leg outside of the operator compartment, Le explained, "It was just a reflex to where I was just trying to take it off but I took it off a little too far. I didn't mean to stick it completely out like that, but it was just spur of the moment, my reflexes." Le denied that he was trying to jump off the forklift or stop its momentum by using his leg against the desk. Le acknowledged that a forklift will not immediately come to a complete stop when the operator lifts his or her foot off the brake pedal. He explained that the forklift would generally glide for some distance, which was dependent on the operational speed of the forklift at the time. But he asserted that five feet "should have been plenty of time for the motor brake to stop." Le also acknowledged that he was trained to not exit the forklift until it came to a complete stop, to keep all body parts inside of the operator compartment while operating the forklift, and to stay out of the "crush zone," which was the area between the forklift and a fixed object. He stated that it was important to adhere to this to avoid serious injury. Le testified that it was his normal practice and routine to remain within the confines of the operator compartment until the forklift was brought to a complete stop because it was "kind of dangerous getting out on [sic] moving equipment."

After the incident, Robert Napier, the FHI site manager, drove the subject forklift and tested each braking system five to six times. Napier asserted that the forklift appropriately stopped during these tests and he was unable to replicate any problems with the braking systems. After conducting his testing, Napier drove the forklift to the distribution center's service area for a postincident inspection. In the six years that he worked for FHI, Napier was aware of only one other incident involving a different forklift where a complaint was made that the braking systems led to an impact with a fixed object. Napier maintained that FHI concluded that Le's incident and the other incident were both caused by operator error. Napier explained, "The manufacturers of stand-up forklifts design them to coast several feet after the brakes are applied. This coasting is desirable for the type of unloading operations being conducted at [the distribution center] as abrupt stopping could dislodge and damage freight being carried by these forklifts."

A few days after the incident, Gerald Meyers, a Crown certified hi-lo technician, inspected the subject forklift at Napier's request. First, Meyers conducted a visual inspection of all items associated with the brakes, including inspecting the foot pedal, listening for the brakes to release and engage, checking for any codes, checking the multitask control handle detent, checking the pedal for wear, checking the pad for function, and checking the wiring and harness. Although there were historic error codes unrelated to the braking issue, Meyers maintained that there were not any current error codes. Meyers did not document his findings, make measurements, or take any videos or photographs during his visual inspection.

After he completed his visual inspection, Meyers drove the forklift to test the forward, reverse, speed up, and slow down function. During this 20-minute process, Meyers brought the forklift up to speed and released the brake pedal and did the same with plugging. He estimated that he did it "[p]robably 25 times each way." He did not record the actual stopping distance or take any photographs or videos. He stated that he went by instinct and feel on the basis of his past experience and measured the stopping distance by the lines on the floor, which he estimated by stepping it off with his shoes. But he did not know the actual stopping distance that he measured. He simply maintained "[i]t was all within limits basically." Meyers also checked the plugging distance setting, the brake force setting, and brake pedal calibration. But he did not record his findings. Meyers did not check the settings for the forward speed, reverse speed, or acceleration

rate. He confirmed that the forklift's coast distance was set at nine, which is the longest coast distance. He recommended to Napier that the coast setting be changed to one, which is the shortest coast distance setting. Napier agreed.[2] When Meyers completed his inspection, he loaded software onto the forklift, recalibrated the multitask control handle, and released the forklift back to service. He documented his findings as follows: "Verified truck operate [sic], paid special attention to braking, no codes and everything operated as should, updated software, adjusted coast distance from setting 9 long coast to 0 shortest coast. Test and return to service."[3]

As for planned maintenance on the forklifts, Meyers testified that he did not follow the planned maintenance schedule in the Crown service manual and did not know the frequency that Crown recommended maintenance.[4] Rather, he relied on notifications from Meijer to alert him when maintenance should be performed and would "try to get to them" when he could. He did not know the frequency intervals Meijer had set for planned maintenance and could not verify whether the subject forklift was serviced in accordance with Crown's recommended maintenance schedules.

The subject forklift was purchased by Meijer in February 2017. The only record of planned maintenance performed on the forklift is by Meyers in January 2023.[5] Meyers did not record the braking distance or the minimum and maximum travel speeds when he performed the preventative maintenance. Less than two weeks before the accident, maintenance work was requested on the subject forklift because the "forks go up by themselves." Meyers replaced the hydraulic potentiometer, calibrated the multitask control handle, and returned the forklift to service. Two weeks after the accident, maintenance work was again requested on the subject forklift. The problem was described as "giving an accelerator sensor error." Meyers stated that an operator either pushed or pulled the multitask control handle too far and exceeded the calibration limits. He cleaned and recalibrated the lever "a little more aggressively." The forklift was returned to service until it was ordered locked out and tagged out because of potential litigation.

Le commenced this negligence action alleging that Meijer owed him a duty to use reasonable care in maintaining and repairing the forklift that was supplied for his use, Meijer breached that duty by failing to maintain and repair the forklift in a reasonably safe manner, and Le was injured as a direct and proximate result of Meijer's negligence. Following discovery, Meijer moved for summary disposition under MCR 2.116(C)(10) asserting that there was no

---

[2] Meyers explained that the forklifts would coast three to five feet at the shortest setting, which was safer because then an empty forklift would not coast far if the operator jumped off early. Later, at Napier's request, Meyers changed the coast setting on all of the forklifts in the distribution center to one.

[3] Meyers testified that zero was a misprint and it should have been a one.

[4] Crown's planned maintenance schedule recommends inspection of the multitask control handle every 60 days or 250 hours, which included inspecting the switches and linkage.

[5] The maintenance was actually requested in January 2021 but it was not completed by Meyers until two years later in January 2023.

evidence that the brakes malfunctioned, no evidence that Meijer breached any duty of care owed to Le, and Le's injuries were solely caused by his own failure to adhere to his employer's training.

In response, Le argued that the forklift clearly malfunctioned and Meijer failed to maintain the forklift in accordance with the manufacturer's requirements. Le's response included an affidavit from Ben Railsback, an expert in mechanical engineering, safety engineering, and accident/incident reconstruction.[6] On the basis of his knowledge, skill, experience, education, and training, Railsback opined that the subject forklift "was not maintained properly, in accordance with Crown standards[,]" which requires maintenance "to be performed every 60 days/250 hours and 12 months/200 hours to make sure that the forklift continues to move materials safely." He further opined, "[H]ad planned maintenance been performed as directed within the RC5500 Service and Parts Manual, Meijer would have had notice of the subject forklift's plugging distance, braking distance, brake pedal range of movement, and the need for any adjustments." Because the forklift was repaired and modified immediately after the incident, Railsback stated that the exact cause of the forklift's failure to stop could not be determined. But he opined, "[H]ad the subject forklift been maintained and/ or repaired so as to function as intended, Mr. Le would have had adequate room to stop before impact."

At the motion hearing, the trial court concluded that Le's own conduct was the sole proximate cause of his injury:

> To me this is a very simple case. If the Defendant [sic] had had any other injuries, whiplash, shoulder, if when he hit this non- moving object something had flown in and hurt him, anything, then I think there would be a valid argument, was there something wrong with the forklift. But, that's not the issue. The only reason he was injured, by his very own testimony, is because he defied the training, he defied what he was told. He put his left leg outside of the operator's compartment and guess what, his left leg got hurt.
>
> So, even if you could somehow prove, and I think circumstantial evidence of the forklift having a problem is—I think you might have a long way to go on that, but even if you could say, oh no, there was something wrong with the forklift, as stated, to determine that the forklift was *the* proximate cause, you have to show that it was unbroken by any new independent cause that produced the injury. And your client sticking his left leg out, caused the injury.
>
> So . . . reasonable minds cannot differ. This is not something that is speculative. This is not something that is circumstantial evidence. The Plaintiff himself had no reason for putting his foot out. He said he wasn't jumping. He wasn't trying to stop the momentum and nothing else got hurt. And he was told that he was not supposed to put body parts outside it, and he didn't do that. And the body part he chose to put outside got hurt. I'm sorry, but that's not surprising.

---

[6] Meijer argued in its reply brief that Railsback's opinion could not be considered because it was not properly disclosed. But the trial court did not reach this issue.

As a matter of law the Plaintiff cannot prove his claim because *the proximate cause of his injury was his own action of putting his left leg outside of the operator's compartment.* [Emphasis added.]

The court granted Meijer's motion for the reasons stated on the record. Le moved for reconsideration, which the trial court denied. This appeal followed.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition under MCR 2.116(C)(10) is warranted when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (cleaned up). When reviewing a motion for summary disposition under MCR 2.116(C)(10), a court must consider the evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*.

"A trial court may not assess credibility, weigh the evidence, or resolve factual disputes, and when material evidence conflicts, it is not appropriate for the court to grant the motion for summary disposition." *Cetera v Mileto*, 342 Mich App 441, 448; 995 NW2d 838 (2022). "[S]ummary disposition is rarely appropriate in cases involving questions of credibility, intent, or state of mind." *In re Handelsman*, 266 Mich App 433, 438; 702 NW2d 641 (2005). "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

## III. ANALYSIS

Plaintiff asserts that the trial court erred by concluding that plaintiff's conduct was the sole cause of his injuries and granting summary disposition to defendant. We agree.

To succeed on a negligence claim, a plaintiff must demonstrate that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Hill v Sears, Roebuck and Co,* 492 Mich 651, 660; 822 NW2d 190 (2012) (cleaned up). " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).

"Cause in fact, also known as factual causation" requires a showing "that but for the defendant's actions, the plaintiff's injury would not have occurred." *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017) (cleaned up). "Establishing cause in fact requires the plaintiff to present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Patrick v Turkelson*, 322 Mich App 595, 617; 913 NW2d 369 (2018) (cleaned up).

Legal causation exists where "the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Ray*, 501 Mich at 64 (cleaned up). Legal causation also

"requires a determination of whether it was foreseeable that the defendant's conduct could result in harm to the victim." *Id*. at 65. "A proper legal causation inquiry considers whether an actor should be held legally responsible for his or her conduct, which requires determining whether the actor's breach of a duty to the plaintiff was *a* proximate cause of the plaintiff's injury." *Id*. (emphasis added). Stated differently:

> The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated. [*Patrick*, 322 Mich App at 617-618 (cleaned up).]

In this case, the trial court assumed for purposes of the motion that plaintiff could establish that there was "something wrong with the forklift" but concluded that plaintiff could not establish that Meijer's negligence was *the* proximate cause of his injuries. This is not the proper standard. While courts deciding negligence issues have sometimes used the phrases "a proximate cause" and "the proximate cause" interchangeably, the Michigan Supreme Court has clarified that: "[I]t is well-established that the proper standard for proximate causation in a negligence action is that the negligence must be 'a proximate cause' not 'the proximate cause.' " *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 497; 791 NW2d 853 (2010). "[T]here can be more than one proximate cause contributing to an injury." *Id*. at 496-497.

But "before an actor can be a proximate cause, there must be the prerequisite determination that the actor was negligent—that is, that the actor breached a duty." *Ray*, 501 Mich at 74. Under the terms of the purchase agreement, Meijer was responsible for maintaining the forklifts in good working condition. Although the trial court assumed for purposes of the motion that there was a problem with the forklift, Meijer argues as an alternative ground to affirm on appeal that there is no evidence that the brakes malfunctioned. Therefore, we begin our analysis here. Le testified that the subject forklift did not respond when he attempted plugging two to three times or when he removed his foot off of the brake pedal. He maintained that he was approximately 15 feet from the desk when he started plugging, which should have been sufficient stopping distance according to Crown's manuals. Le told a coworker that forklift did not stop and actually went faster when he moved his foot off the sensor. He told his coworker that he was not sure whether the brakes were not working at all, he just knew that it did not brake when he got off the sensor.[7] Le explained, "I couldn't tell, like, at the time if it was braking or not, like, because it was just, like, a spur-of-the-moment thing and I couldn't tell, like, if it was or not . . . but I felt like it wasn't but that's when I took my foot off and then . . . ." Le also testified that he completed a preuse inspection

_____

[7] This conversation was through text messages. The messages were read into the record at Le's deposition and thus we have relied on the deposition transcript for the content of the conversation. On appeal, defendant has included a copy of the text message conversation as an exhibit. Because the copy of the text message conversation was not part of the record before the trial court, we have not considered it on appeal. See *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002) ("This Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal.")

five minutes before the incident and there were no issues detected. And he drove the forklift to the front of the warehouse without any issue.

If the forklift was properly maintained, calibrated, and working, it should have stopped before it reached the desk. The Crown service manual dictates that proper adjustments must be made to the forklift if it exceeds the stopping distance parameters stated in the manual. There is no evidence in the record what the forklift's stopping distance was for either braking method before the incident. After the incident, Meyers measured those distances by feel and the lines on the floor but he did not record any measurements. Meyers simply testified that "it was within the range." However, he did not know the actual stopping distance. In other words, one must accept his word that it was within the appropriate parameters. And while Napier and Meyers both testified that they test-drove the forklift after the incident and did not detect any braking issues, neither of them documented their findings with photographs, videos, measurements, or any other documentation other than to note that no issues were detected and "everything operated as should." Conversely, Le testified that the forklift did not respond as it should.

On the basis of the record evidence, reasonable minds could conclude that the multitask handle and/or the service brake did not operate as they were supposed to and/or the stopping distance was not appropriately adjusted within the required parameters. A jury could also reasonably conclude that Le did not attempt plugging two to three times at least 15 feet from the desk and then removed his foot from the brake pedal as he testified, or that Le was attempting to jump off the forklift contrary to his testimony. Thus, reasonable minds could differ as to the cause of the accident. We may not assess credibility or resolve factual disputes in analyzing whether a genuine issue of material fact exists. *Cetera*, 342 Mich App at 448. Viewing the evidence in the light most favorable to Le as the nonmoving party, there is a genuine issue of material fact whether the forklift was properly maintained, calibrated, and working as it should at the time of the incident.

We must next determine if there is a material factual dispute whether defendant's negligence was a cause in fact of the plaintiff's injuries. *Ray*, 501 Mich at 64. "Although causation cannot be established by mere speculation, a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support[.]" *Patrick*, 322 Mich App at 618 (cleaned up). Normally, the existence of cause in fact is a question for the jury to decide, but if there is no issue of material fact, the question may be decided by the court. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NW2d 248 (2003).

Le testified that he had worked for FHI for over a year and, during that time, he never experienced an issue with braking systems on any of the forklifts. However, he maintained that the braking system did not respond on the date of the incident and because the forklift did not stop, his leg was crushed. Le presented evidence demonstrating a logical sequence of cause and effect sufficient to create a genuine issue of material fact regarding cause in fact. A jury could reasonably conclude from the evidence that the forklift did not operate as it was supposed to and more likely than not, but for the forklift malfunctioning, it would not have collided with the desk and Le would not have been injured.

Meijer argued, and the trial court agreed, that Le's own action of extending his leg outside of the operator compartment was the sole cause in fact of his injuries as a matter of law. We disagree. The fact that Le extended his leg outside of the operator compartment contrary to his training implicates his potential comparative fault. "The doctrine of comparative fault requires that every actor exercise reasonable care." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 33; 761 NW2d 151 (2008). "The standards for determining the comparative negligence of a plaintiff are indistinguishable from the standards for determining the negligence of a defendant, and the question of a plaintiff's own negligence for failure to use due care for his own safety is a jury question unless all reasonable minds could not differ or because of some ascertainable public policy consideration." *Rodriquez v Solar of Mich, Inc*, 191 Mich App 483, 488; 478 NW2d 914 (1991). When assessing the comparative negligence of the parties, "[s]o long as there is a finding of proximate cause in each case, the negligence of the parties must be compared." *Brisboy v Fibreboard Corp*, 429 Mich 540, 552; 418 NW2d 650 (1988).

Le acknowledged that he was trained to not exit the forklift until it came to a complete stop, to keep all body parts inside of the operator compartment while operating the forklift, and to stay out of the "crush zone" to avoid serious injury.[8] He stated that he was not trying to jump off the forklift or stop the momentum. He could not explain why he extended his leg outside of the operator compartment other than simply a reflex in the moment. Although Le extended his leg beyond the operator compartment, a jury could reasonably conclude that he would not have sustained any injuries if the forklift's braking system was properly functioning. A jury could also reasonably conclude that, despite the malfunctioning brake system, Le would not have sustained any injuries if his leg was inside the operator's compartment. But Le's comparative negligence, if any, is an issue for the trier of fact to determine.

Additionally, injuries of various kinds, including crush injuries, are a foreseeable result of failing to maintain a forklift in a workable condition. If a forklift's stopping distance is not properly calibrated, its brake system is malfunctioning, and/or its multitask control handle is malfunctioning, it is foreseeable that the forklift may collide with a stationary object and the operator may sustain injuries. In fact, the operator manuals and the training modules warn about the dangers of potential crush injuries. Although the manuals and training modules also caution operators to keep all body parts inside of the operator compartment while the forklift is moving, it is foreseeable that an operator may fail to adhere to the safety standards and extend an appendage beyond the confines of the compartment. A jury could reasonably conclude that Meijer's failure to maintain the forklift in a workable condition is a legal cause of Le's injuries.

The trial court erred by granting summary disposition to Meijer. There are genuine issues of material fact regarding Meijer's negligence, both the cause in fact and the legal cause of Le's injuries, and Le's comparative negligence, if any.

---

[8] On appeal, Meijer has included a copy of the "Safety Advisories" as an exhibit. Because this was not part of the record before the trial court, we cannot consider it on appeal. See *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56

Reversed and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ Michael J. Kelly
/s/ Sima G. Patel
/s/ Daniel S. Korobkin